IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-02832-RBJ

(Consolidated with Civil Action No. 12-cv-02971-RBJ)

In re GOLD RESOURCE CORP. SECURITIES LITIGATION

---

## ORDER

---

This case is before the Court on defendants' Motion to Dismiss Plaintiff's First Amended and Consolidated Class Action Complaint for Violation of the Federal Securities Laws [docket ##35, 36] and Lead Plaintiff's Motion to Strike or Disregard Portions of Defendants' Reply in Support of Defendants' Motion to Dismiss [#43].  On April 29, 2013, the Court held oral argument on the motions and took the matters under advisement.  *See* [#46].  This order addresses all pending motions.

### I. Facts

Plaintiff Nitesh Banker is the appointed lead plaintiff in this consolidated action against Gold Resource Corporation ("GRC") and four of its officers and directors: William Reid, GRC's Chief Executive Officer and Chairman of the Board of Directors; Jason Reid, GRC's President; David Reid, GRC's Vice President, Secretary, and Treasurer; and Bradley Blacketor, GRC's Chief Financial Officer.  Plaintiff Banker has filed a First Amended and Consolidated Class Action Complaint [#32], individually and on behalf of all purchasers of GRC common stock between January 30, 2012 and November 8, 2012 (the "Class Period").  Plaintiff alleges that defendants committed securities fraud pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Plaintiff also asserts claims against

1

individual defendants as "control persons" pursuant to Section 20(a) of the Act.  15 U.S.C. § 78t(a).

### A.  Gold Resource Corporation and the El Aguila Mining Project.

GRC is a publicly traded mining company that primarily focuses on the production and development of gold and silver projects.  First Amended Complaint ¶ 30.  GRC is considered an "exploration stage company" that has seven full-time employees in the United States and more than 300 Mexican nationals as employees at its properties in Mexico.  *Id.* ¶ 31–32.

The facts of this case involve commercial production on GRC's *El Aguila* project in Mexico, which primarily involves mining and processing ore from an open-pit mine and an underground mine at the *La Arista* vein system.  *Id.* ¶ 39–40.  Much of GRC's activity at issue involved "stoping," or the removal of wanted ore from an underground mine leaving behind an open space called a "stope."  *Id.* at iii.  GRC also engaged in "long-hole stoping," which is a profitable stoping technique that "can be the lowest cost method of mining when large ore bodies are located in strong country rock."  *Id.*  On July 1, 2010 commercial production at the *El Aguila* project was announced; active underground mining began in November 2010.  *Id.* ¶ 39, 41.

GRC's business plan was to increase production from mining—as measured in ounces of AuEq, or precious metal gold equivalent—dramatically in its initial years.  *Id.* ¶ 44.  This production measurement "is determined by taking the silver payable metal ounces produced and converting them to the dollar equivalent of gold by using the gold to silver average price ratio.  The gold and silver average prices used are the actual metal prices realized from the sales of metals concentrate."  *Id.* at iii.  Specifically, GRC's plan was to increase from 70,000 ounces of AuEq in the first year of mining operations, to 100,000 in the second year, to 120,000 for the

following four years.  *Id.* ¶ 44.  The business plan also called for substantial dividends for

investors.  The dividend program was formalized in 2011.  *Id.* ¶ 47.

Plaintiff alleges, however, that the *El Aguila* project began suffering from severe

production problems beginning in early 2012.  These alleged problems included:

> (1) overly aggressive expansion of underground mining operations during the first quarter of 2012;
>
> (2) forced mining of lower grade zones of the deposit;
>
> (3) failure to make "significant operational efficiency improvements . . . , including the need to upgrade electric power through the mine, expand ventilation and handle increased ground water the deeper the mine went, limiting the Company's ability to mine higher grade stopes;" and
>
> (4) decreased long-hole stoping, forcing GRC to process more diluted development and mine from areas of the deposit with lower metal grades.

*Id.* ¶ 49.  Plaintiff alleges that because of these problems, tonnes (metric tons) produced by

stoping as a percentage of milled ore decreased from 55% during the first quarter to 14% during

the second quarter of 2012.  *Id.*

Furthermore, plaintiff alleges that GRC was improperly "recognizing 'sales' that were

not actual sales of product mined, but were part of an overbilling scheme," thus inflating their

reported production statistics.  *Id.* ¶ 9.  GRC has two major buyers for all of its mining

concentrate.  *Id.* ¶ 50.  GRC invoices these buyers first with a "provisional invoice," which is

calculated using GRC's own sampling and assaying results.  *Id.* ¶ 51.  GRC recognizes revenue

based upon these provisional invoices.  *Id.*  On delivery, another concentrate sample, the "final

sample," is taken.  *Id.* ¶ 52.  The final price paid by the buyer is adjusted to the final sample

results.  *Id.*  Therefore, any difference between the provisional sample and the final sample

would "inflate" previously reported revenue based on provisional invoices.

**B. Defendants' Statements during the Class Period.**

According to plaintiff, these production problems and the "overbilling scheme" were actively concealed from GRC's investors through a series of material, false and misleading statements by GRC and its executive officers.   In essence, defendants' allegedly misleading statements fall within the following categories: (1) announcements of production or revenue results, particularly those characterizing them as "record" results; (2) statements about anticipated production results in the future; (3) assurances of the effectiveness of GRC's internal control over financial reporting; and (4) statements related to what plaintiff characterizes as the "overbilling scheme" that resulted in GRC issuing a restatement in November 2012.

On January 30, 2012, the beginning of the Class Period, GRC announced its preliminary "record" production results for end of 2011.  *Id.* ¶ 65.  The press release stated, "We look forward to achieving our 2012 targets as we continue on our trajectory for aggressive production growth."  *Id.* ¶ 62; *see also id.* ¶ 65 (defendant William Reid stating that "these results demonstrate our ability to execute the business plan we have articulated from day one, and we are just getting started" and that GRC was "one of the lowest cost gold producers with one of the tightest capital structures in the industry").

Plaintiff claims, however, that as early as February 2012, GRC began observing "significant variances" between its provisional invoices and the final sample assays performed by the buyer, which would cause negative adjustments to the final revenue recognized by GRC. *Id.* ¶ 54.  Plaintiff alleges that the buyer of the concentrates informed GRC of the significant variances "within a month or two" following shipment of the concentrate.  *Id.*

On February 29, 2012, GRC filed its 2011 Form 10-K annual report stating that "management concluded that we maintained effective internal control over financial reporting as

4

of December 31, 2011." *Id.* ¶ 66.  The Form 10-K included a sworn certification by CEO

William Reid pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.  *Id.* ¶ 67.

During a conference call with investors on March 1, 2012, William Reid reiterated the

record production results in 2011, stated that stope development at *La Arista* was on track with

anticipated increased stoping.  *Id.* ¶ 70 ("[A]t this point in time, we feel comfortable that we will

be able to achieve our 900 tons per day [of production].").

In an April 9, 2012 press release GRC announced its first quarter preliminary results,

which were "in line" with anticipated production, in part due to "increase long-hole stoping."  *Id.*

¶ 75; *see also id.* ¶ 76 (defendant Jason Reid stating that "[f]irst quarter record production sets a

firm base from which to continue our growth trajectory of producing more low cost ounces").

Another press release on April 30 stated, "With record first quarter production, the increased

April dividend to six cents per common share per month speaks to the positive outlook we have

for the continued success and production trajectory of the Aguila Project."  *Id.* ¶ 78.

A May 10, 2012 press release reiterated similar sentiments.  *Id.* ¶ 80 (defendant Jason

Reid stating that "[t]he first quarter set a strong base for the Company with record production,

record revenues and dividends of $7.9 million while focusing on aggressive growth").  GRC also

filed its quarterly report for the first financial quarter with the SEC on May 10.  *Id.* ¶ 81–83

("There was no change in our internal control over financial reporting that occurred during the

quarter ended March 31, 2012, that has materially affected, or is reasonably likely to materially

affect, our internal control over financial reporting.").  On May 11, 2012, defendant Jason Reid

again stated that GRC was "transitioning into more long-hole open stoping."  *Id.*  ¶ 84.

On July 19, 2012, in an after-hours press release, GRC for the first time disclosed what the plaintiff characterizes as "massive production problems." *Id.* ¶ 90. The press release disclosed that second quarter production "was lower than expected," which was in part due to

> Arista underground mine infrastructure needs coupled with mining of lower grade zones of the deposit . . . . These development activities limited the Company's preparation and mining of higher grade stopes. Decreases in long-hole stoping resulted in both processing more diluted development ore and required mining from areas of the deposit with lower metal grades. Tonnes from stoping as a percentage of milled ore decreased from an estimated year-to-date high of 55% during the first quarter of 2012 to an estimated year to-date low of 15% during the second quarter.

> As a result of the decrease in second quarter production, the Company revises its 2012 Outlook by ~15% to a targeted annual production range of 100,000 to 120,000 ounces AuEq, at an estimated 53:1 price ratio. This represents a decrease from its previous 2012 target of 120,000 to 140,000 AuEq.

*Id.* ¶ 89. Plaintiff alleges that this caused GRC's stock to drop on the next trading day from $24.99 to $17.34, more than a thirty percent decrease. *Id.* ¶ 93.

On August 9, 2012, GRC announced "disappointing" second quarter production results and echoed that production problems during the second quarter slowed results. *Id.* ¶ 96. On the same day, GRC filed its quarterly report for the second quarter with the SEC. *Id.* ¶ 97 ("There was no change in our internal control over financial reporting that occurred during the quarter ended June 30, 2012 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.").

The next day, defendant William Reid assured investors on a conference call that "I am pleased to report we are now back mining from development stopes in higher grade zones . . . . I can state that our production is going to more of what we expect." *Id.* ¶ 104. An investor inquired on the long-hole stoping percentage released in the previous July 19 press release:

> Q: The 7/19 PR stated that the stope percentage for Q1 was 55%. What stope level was milled in Q1?

> A: Okay.  A little bit of confusion over that.  We gave the high and the low, basically if you look at the production from stoping in Q1, it averaged 40%.  If you look at the stoping in Q2, it averaged 20%. So basically it was about half.  In addition we were actually in the second quarter mining some of that from lower grade areas.  So that's the actual numbers.

*Id.* ¶ 106; *see supra*, *id.* ¶ 89 (press release stating that "[t]onnes from stoping as a percentage of milled ore decreased from an estimated year-to-date high of 55% during the first quarter of 2012 to an estimated year to-date low of 15% during the second quarter").

On October 17, 2012, GRC announced in a press release its third quarter results, which were significantly lower than the targeted production even though they showed an increase from the second quarter.  *Id.* ¶ 110.  The press release also disclosed a billing dispute requiring adjustments to previous invoices:

> A dispute arose during the third quarter with the buyer of the Company's metal concentrates that involves the buyer's handling, control and sampling of those concentrates at the buyer's warehouse, and the resulting assays the buyer obtained from those samples.  The buyer is claiming net adjustments (reductions) to the Company's provisional invoices of approximately 2,300 AuEq ounces.

*Id.* ¶ 112.  Plaintiff alleges that, contrary to GRC's representations in the press release, "the 'dispute' did not concern possible misconduct by the buyer, but known misconduct by GRC in improperly billing the buyer for product that it never sent to the buyer."  *Id.*  ¶ 113.  After the press release, GRC's shares dropped from its previous day's closing price of $20.15 per share to $18.01 per share, a 10% decrease.  *Id.* ¶ 111.

On the last day of the Class Period, November 8, 2012, GRC issued a press release after the close of the market that indicated that during the third quarter of 2012 the Company's executive management became aware of "large variances between the results of the Company's preliminary assays used for determining the provisional sales price for its concentrate sales when compared to the assays obtained from samples after shipment to the buyer used to determine

final sales price." *Id.* ¶ 116.  After the press release, the GRC stock again dropped in value, by $0.50 per share from the previous day.  *Id.* ¶ 118.

A Form 8-K submitted to the SEC detailed the related restatement by GRC and settlement with the buyer.  *Id.* ¶ 116.  The settlement with the buyer required, for the purposes of final invoice and payment, the adoption of the preliminary assays taken prior to shipment of concentrates for April, May and June 2012, but not for February and March 2012.  *Id.*  This resulted in GRC restating its "first and second quarter 2012 financial statements to reflect a net reduction to revenues of approximately $3.7 million for the six months ended June 30, 2012, of which $3.0 million represents the cash settlement with the buyer and $0.7 million represents a non-cash derivative adjustment."  *Id.*

GRC admitted that "[t]his deficiency constitutes a material weakness in the Company's control over financial reporting," but also stated that "[a]s of September 30, 2012, management believes the internal control deficiency has been remediated."  *Id.*  According to plaintiff, this shows that "by at least September 30, 2012, the Company was not only aware that material problems existed with its systems of internal accounting control, but that it had already taken remedial steps and allegedly had corrected the problems."  *Id.*

## II.  Motion to Strike [#43]

Before reaching the motion to dismiss, plaintiff has asked this Court to strike or disregard portions of the defendants' reply brief [#40] that employ "reply by ambush" tactics.  Plaintiff argues that defendants do not respond to plaintiff's arguments in his response [#39] and instead assert new arguments not previously raised in their motion to dismiss.

Although plaintiff is correct that the Court "generally does not review issues raised for the first time in a reply brief," the Court will "make an exception when the new issue argued in the reply brief is offered in response to an argument raised in the [plaintiff's] brief."  *Beaudry v.*

*Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n. 3 (10th Cir. 2003).  In responding to defendants' argument that GRC's mining-projection statements are covered by the PSLRA's safe harbor provision for forward-looking statements, plaintiff relies on three statements by GRC that he claims are not forward-looking but historical statements.  Defendants are responding to that argument—which plaintiff himself raises in the response—when defendants argue that those three statements do not support a securities fraud claim.  Accordingly, the Court declines to strike or disregard any portion of the defendants' reply brief.

### III.  Motion to Dismiss [#35]

#### A. Standard of Review.

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.*

Complaints in civil actions generally should contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. (8)(a)(2).  "A plaintiff suing under Section 10(b), however, bears a heavy burden at the pleading stage."  *In re Level 3 Communications, Inc. Securities Litigation*, 667 F.3d 1331, 1333 (10th Cir. 2012).  To state a securities fraud claim, a plaintiff's complaint must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or

9

recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Id.* (quoting *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1095 (10th Cir. 2003)).

Prior to the passage of the Private Securities Litigation Reform Act of 1995 (PSLRA), Federal Rule of Civil Procedure Rule 9(b) governed the pleading requirements for scienter. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001). Now, however, under the PSLRA, a heightened pleading standard applies to the first and third of these elements. *Id.* The PSLRA requires that:

> (1) [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> (2) [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)–(2).

**B. Conclusions.**

Plaintiff brings this securities fraud case under Section 10(b) of the Securities Exchange Act and Rule 10b-5.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Under Section 10(b) of the Securities Exchange Act, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  In implementing the Securities Exchange Act, Rule 10b-5 prohibits, *inter alia*, "mak[ing] any untrue statement of a material fact."  17 C.F.R. § 240.10b-5.

In moving to dismiss the Class Action Complaint, the defendants challenge the sufficiency of the pleadings on two grounds: (1) whether the class action complaint sufficiently pleads facts establishing that defendants made false or misleading statements of material fact,

particularly as to defendant's mining projection statements, which defendants argue are protected by the PSLRA's safe harbor provision; and (2) whether the complaint sufficiently pleads facts establishing scienter, particularly with respect to any statements related to the November restatement.[1]  I address these arguments in turn below.

Before delving into any detailed analysis, however, I first note that defendants have filed two unopposed requests for judicial notice of various publicly-available documents, including GRC press releases, forms filed with the SEC, transcript of earnings conference calls, and a Google Finance chart showing opening and closing stock prices on August 10, 2012.  [##37, 41]. The Court takes judicial notice of these documents pursuant to Federal Rule of Evidence 201(b)(2).  *See Tellabs*, 551 U.S. at 322; *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").

### 1. Forward-Looking Statements.

GRC first argues that all statements that GRC and its officers made about its mining projections were forward-looking statements, and that they therefore are not actionable pursuant to the PSLRA's safe harbor provision in 15 U.S.C. § 78u-5(c).  Plaintiff responds that the

---

[1] Among other things defendants suggest that the First Amended Complaint is an example of "puzzle pleading."  *See Level 3 Communications,* 667 F.3d at 1339 n. 8 (citing Judge Brimmer's underlying order).  The complaint is lengthy, nearly seventy-pages in all, but as in *Level 3,* it has a tendency to "excerpt[] long passages including numerous statements and, to a large degree, leave[] the Court to the task of teasing out which specific statements are at issue." *Id.* (internal quotation marks omitted).  In light of the amount of briefing that has been filed notwithstanding these failures, and now "[h]aving managed to 'teas[e] out' the most relevant statements from plaintiff's lengthy complaint," this Court, like the *Level 3* courts, finds that this is not a particularly helpful manner of pleading.

complaint pleads "misstatements of historical fact," citing to three specific statements, and that

these misstatements of historical fact are not protected by the safe harbor.  Resp., [#39] at 15–18.

"Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of

potential liability for forward-looking statements, which often kept investors in the dark about

what management foresaw for the company."  *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th

Cir.1999) (citing H.R. Conf.Rep. No. 104369, at 42 [1995], reprinted in 1995 U.S.C.C.A.N. 730,

741).  Accordingly, § 78u-5(c) protects "any forward-looking statement, whether written or

oral," where:

> (A) the forward-looking statement is--
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement--
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>> (ii) if made by a business entity; was--
>>> (I) made by or with the approval of an executive officer of that entity; and
>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

§ 78u-5(c)(1)(A)–(B).

The Tenth Circuit has yet to determine whether the three protected categories—(1)

forward-looking statements accompanied by "meaningful cautionary statements," (2) forward-

looking statements that are "immaterial," and (3) forward-looking statements made without

"actual knowledge" of its falsity—are to be read disjunctively as the statutory language suggests,

or conjunctively such that the "actual knowledge" requirement spans to the first two categories.

*Cf. In re Aetna, Inc. Securities Litigation,* 617 F.3d 272, 278–79 (3d Cir. 2010).  Other circuit

courts, however, have held that the "actual knowledge" test in § 78u-5(c)(1)(B) is not read into

the first two tests. *See In re Cutera Securities Litigation,* 610 F.3d 1103, 1112–13 (9th Cir.

2010) (listing cases holding that disjunctive reading is mandated by the statutory text).  I agree.

Specifically, in the *Aetna* case the court concluded that "[t]he logical reading of the

statute is simply to take it as written—subsections (A) and (B) and their subpoints each offer safe

harbors for different categories of forward-looking statements.  The defendants' state of mind is

not relevant to subsection (A)."  *Id.* at 1113.  In other words, even if the defendants made a

forward-looking statement *with knowledge* of its false or misleading nature, that forward-looking

statement is still protected if it is either immaterial or "accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from

those in the forward-looking statement."  § 78u-5(c)(1)(A)(i)–(ii).  I conclude that this is a

reasonable and logical interpretation of the statute.

Here, the defendants argue that their statements are not actionable both because of the

presence of meaningful cautionary language and because plaintiff fails to allege actual

knowledge.  I then look first at which of the numerous allegedly false and misleading statements

are "forward-looking" under the statute.  *See Aetna,* 617 F.3d at 281.  Then I turn to whether the

forward-looking portions of the statements are protected under the meaningful cautionary

language test or under the actual knowledge test.[2]

### a.  Mixed Statements of Historical Fact.

Section 78u-5(i)(1) defines the term "forward-looking statement" as:

---

[2] But, as I discuss below in Part III.B.2, the class action complaint fails to allege particularized
facts establishing scienter, regardless of whether these statements are considered "mixed"
statements of current fact and future projection.

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

The distinction must be made between statements of future projections and statements of current or historical fact, as the latter are not protected by the safe harbor.  *See, e.g.*, *Mishkin v. Zynex Inc.*, No. 09-CV-00780-REB-KLM, 2011 WL 1158715, at *5 (D. Colo. Mar. 30, 2011) (citing *Grossman v. Novell, Inc* ., 120 F.3d 1112, 1123 (10th Cir. 1997), holding the same under the "bespeaks caution" doctrine); *In re Ribozyme Pharmaceuticals, Inc. Securities Litigation,* 119 F. Supp. 2d 1156, 1163 (D. Colo. 2000).  Here, the alleged false and misleading statements do include many that are at least superficially "forward-looking."  For example, defendants emphasize statements such as those in their January 30 and February 29 press releases: "We *look forward* to achieving our 2012 targets as we continue on *our trajectory* for aggressive production growth;" and "these results demonstrate our ability to execute the business plan we have articulated from day one, and *we are just getting started.*"  *Id.* ¶ 62, 65 (emphasis added).

Other examples include statements such as:

- "[A]t this point in time, we feel comfortable that we will be able to achieve our 900 tons per day [of production]."  (March 1 conference call, *id.* ¶ 70).

- "First quarter record production sets a firm base from which to continue our growth trajectory of producing more low cost ounces." (April 9 press release, *id*. ¶ 75).

- "With record first quarter production, the increased April dividend to six cents per common share per month speaks to the positive outlook we have for the continued success and production trajectory of the *Aguila* Project." (April 30 press release, *id*. ¶ 78).

- "The first quarter set a strong base for the Company with record production, record revenues and dividends of $7.9 million while focusing on aggressive growth." (May 10 press release, *id*.¶ 80).

- "With the next three quarters of production prepared and ready to be stoped we believe we have created the lead time needed to continue *Arista* mine production and development on a more sustainable long term basis." (July 19 press release, *id*. ¶ 94).

- "I am pleased to report we are now back mining from development stopes in higher grade zones . . . . I can state that our production is going to be more of what we expect." (August 10 conference call, *id*. ¶ 104).

Nonetheless, on a closer look, many of these statements are "mixed" statements of both present and future events. "Forward-looking conclusions often rest both on historical observations and assumptions about future events." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999). "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Stone & Webster*, *Inc. Securities Litigation,* 414 F.3d 187, 213 (1st Cir. 2005). Rather, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc*. (*Tellabs II*), 513 F.3d 702, 705 (7th Cir. 2008).

In *Tellabs II*, the Seventh Circuit interpreted a statement that sales of a product were "still going strong" as meaning "both that current sales were strong and that they would continue to be

so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse." 513 F.3d at 705.  The court held that safe harbor protection did not extend to any representation about current sales.  *Id.*

Similarly, in *Stone & Webster*, the First Circuit interpreted a statement that the company "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs" as being a mixed statement.  414 F.3d at 207, 212.  Despite the statement's referral to anticipated future needs for funds, "the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage.  The claim was not that the Company was understating its future cash needs." *Id.* at 213.

In *Institutional Investors*, the statements at issue included: "Our first quarter results *position us* to meet our goals for the year;" and "we are *on track* to meet our goals for the year, even though there were some aspects to our performance that are below our expectations and that we are working on to improve." 564 F.3d at 254.  The Third Circuit held that "[u]nlike the language in *Tellabs II* and *Stone & Webster*, the 'on track' and 'position us' portions of the January 25, 2005 statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part." *Id.* at 255.  Instead, any "current fact" representations in these statements are too vague to be actionable. *Id.* "These statements do not justify the financial projections in terms of any particular aspect of the company's current situation; they say only that, whatever that situation is, it makes the future projection attainable. Such an assertion is necessarily implicit in every future projection." *Id.*

Some of the statements challenged in this case resemble those in *Tellabs II* .  The defendants, in affirming their future projections, repeatedly related back to and emphasized the

"record" production results or "aggressive growth" that GRC had purportedly been experiencing. *See, e.g.*, First Amended Complaint ¶ 62 ("as we *continue* on our trajectory for aggressive production growth"); ¶ 75 ("record production sets a firm base from which to *continue* our growth trajectory"); ¶ 78 ("positive outlook we have for the *continued* success and production trajectory of the Aguila Project"); ¶ 80("first quarter set a strong base . . . while focusing on aggressive growth").  The statements go a step further than those in *Institutional Investors*; they do in fact "justify the financial projections in terms of [a] particular aspect of the company's current situation."  564 F.3d at 255.

These statements not only suggest that GRC would see "aggressive growth" in the future, but necessarily that this growth would be a continuation of GRC's *current* experience of "aggressive growth" and "record production."  The alleged falsehood here is not that GRC was overstating its hopes for future growth, but rather that GRC was *at that time* growing aggressively already.  *See* Resp., [#39] at 17; *cf. Stone & Webster*, 414 F.3d at 213.  Thus, to the extent that these statements make affirmations about the current state of GRC's growth or production, those aspects of the statements are not forward-looking and not protected.  Indeed, these statements would be misleading if GRC knew that its production rate were in collapse or about to collapse.  *Cf. Tellabs II*, 513 F.3d at 705.

### b. *Accompanying Cautionary Statements and Actual Knowledge.*

Any future projections on the flip side of these mixed statements, however, are protected under the safe harbor provision as long as they are immaterial, made with accompanying meaningful cautionary statements, or made without actual knowledge of their falsity.  § 78u-5(c)(1).  I agree with the defendants both that the forward-looking aspects of the statements were sufficiently "accompanied by meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the forward-looking statement," and that plaintiff failed to plead sufficient allegations establishing defendants' actual knowledge of the falsity of those predictions.  § 78u-5(c).

The press releases by GRC all contained a "cautionary statements" warning that any forward-looking statements "involve risks and uncertainties" and that they "are based upon information available to Gold Resource Corporation on the date of this press release, and the company assumes no obligation to update any such forward-looking statements."  *See, e.g.*, January 30 press release, [#38-2] at 7; February 29 press release, [#38-3] at 5–6; April 9 press release, [#38-4] at 2–3.[3]  GRC warned further that its "actual results could differ materially from those discussed in this press release.  In particular, there can be no assurance that production will continue at any specific rate."  *Id.*

---

[3] The full "Cautionary Statements" on the press releases is as follows:

> This press release contains forward-looking statements that involve risks and uncertainties. The statements contained in this press release that are not purely historical are forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. When used in this press release, the words "plan", "target", "anticipate," "believe," "estimate," "intend" and "expect" and similar expressions are intended to identify such forward-looking statements. Such forward-looking statements include, without limitation, the statements regarding Gold Resource Corporation's strategy, future plans for production, future expenses and costs, future liquidity and capital resources, and estimates of mineralized material. All forward-looking statements in this press release are based upon information available to Gold Resource Corporation on the date of this press release, and the company assumes no obligation to update any such forward-looking statements. Forward looking statements involve a number of risks and uncertainties, and there can be no assurance that such statements will prove to be accurate. The Company's actual results could differ materially from those discussed in this press release. In particular, there can be no assurance that production will continue at any specific rate. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in the Company's 10-K filed with the Securities and Exchange Commission[.]

"[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp*., 182 F.3d 799, 807 (11th Cir. 1999); *see also In re Williams Securities Litigation,* 339 F. Supp. 2d 1206, 1220 (N.D. Okla. 2003). Even "mere boilerplate" cautionary statements such as GRC's form warning have been upheld as sufficient. *Id.* Thus, the cautionary statements here suffice to bring the forward-looking portions of the challenged statements under the safe harbor of § 78u-5(c).

Moreover, the forward-looking statements are protected because plaintiff alleges no facts establishing "actual knowledge" of falsity of the projection statements. Under the safe harbor provision, a statement is protected where the plaintiff fails to prove that it was either made by a natural person "with actual knowledge by that person that the statement was false or misleading," or made by a business entity through an executive officer "with actual knowledge by that officer that the statement was false or misleading." § 78u-5(c).

"A complication introduced by the Private Securities Litigation Reform Act is that 'actual knowledge' of falsity, not merely indifference to the danger that a statement is false, is required for liability for 'forward-looking' statements—predictions or speculations about the future." *Tellabs II*, 513 F.3d at 705 (citing § 78u-5(c)(1)(B)(ii)). Thus, at the pleadings stage, the heightened scienter requirement is further heightened: "the 'strong inference' that must be drawn to avoid dismissal cannot be an inference merely of recklessness if predictions are challenged as fraudulent." *Id.*; *see also Institutional Investors*, 564 F.3d at 274 ("the scienter requirement for forward-looking statements is stricter than that for statements of current fact").

Plaintiff here has failed to state beyond mere conclusory allegations that any of the individual defendants or other executives of GRC had actual knowledge of the falsity of their statements at the time the statements were made.  *See Grossman*, 120 F.3d at 1124 ("plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*"); *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 681 (D. Colo. 2007).  Instead, plaintiff pleads only that defendants, as a natural consequence of their executive positions, had access to adverse information related to GRC's growth projections and should have known the projections were unattainable.  *See* First Amended Complaint ¶ 145.  These allegations do not pass muster under the stringent "actual knowledge" test in the safe harbor provision.  *See Fleming Cos.*, 264 F.3d at 1264.  Even under the less strict scienter requirement for statements of current fact, "[a]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate.'"  *Id.* (quoting *In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 539 (3d Cir. 1999).  "Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company."  *Id.*; *cf. Adams*, 340 F.3d at 1105–06 (particularized facts establishing scienter where chief financial officer was directly informed of unprofitable ventures and where his own complaints demonstrated knowledge of the future loss).

Accordingly, I find that these portions of the "mixed" statements that are forward-looking are protected under the PSLRA's safe harbor provision and are therefore insulated from liability under federal law.  I next turn to those historical misstatements of fact that plaintiff challenges.

### 2. Non-Forward-Looking Statements.

Along with the "historical misstatements of fact" contained in the "mixed" statements above with respect to GRC's record production and aggressive growth, plaintiff also emphasizes statements between March and May 2012 regarding GRC's increasing its long-hole stoping; statements in the July 19, 2012 press release as to the first quarter stoping rate; and statements regarding GRC's profits resulting from its "overbilling scheme," culminating in the November restatement. *See* Resp., [#39] at 15-26. These, plaintiff argues, were historical statements that were either false or misleading. *Id.* Defendants respond that these statements, even if not protected by the safe harbor, cannot establish a securities fraud action, because plaintiff fails to allege facts establishing a strong inference of scienter.

A "strong inference" of scienter must be "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams*, 340 F.3d at 1105. "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (internal quotation marks and citations omitted). To survive a motion to dismiss, "[t]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "When reviewing a plaintiff's allegations of scienter under the PSLRA, a court should . . . examine the plaintiff's allegations in their entirety . . . and determine whether the plaintiff's allegations, taken as a whole, give rise to a strong inference of scienter." *Fleming Cos.,* 264 F.3d at 1263.

First, as to any statements that GRC was experiencing "record" production results and "aggressive growth," this Court finds that plaintiff has failed sufficiently to allege that defendants knew that these statements were false—if they are false at all.  Rather, labeling the production rate as "record" or the growth rate as "aggressive" is a good example of "corporate optimism" or "mere puffing" that is "not capable of objective verification."  *Grossman*, 120 F.3d at 1119.  In a similar vein, with respect to statements by GRC that it was increasing its long-hole stoping, the complaint lacks particularized allegations showing either the falsity of those statements at the time they were made or defendants' contemporaneous knowledge of the later-disclosed problems that led to decreased long-hole stoping.

"Plaintiffs should not be allowed to proceed with allegations of fraud by hindsight . . . because corporate officials should be liable for failing to reveal only those material facts reasonably available to them."  *Fleming Cos.*, 264 F.3d at 1260 (internal quotation marks and citation omitted).  "What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false."  *Grossman*, 120 F.3d at 1124.  As is common with securities fraud cases where an intervening event—the production problems in the instant case—occurs "between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price)," the plaintiff has the burden to plead, "as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*."  *Id.*

Here, plaintiff has pleaded no facts showing that GRC knew at each iteration of its production results that those results were not as represented.  Nor has plaintiff pleaded facts suggesting that GRC knew in March through May that long-hole stoping was not an option or that GRC intended not to transition into it.  Any after-the-fact admissions regarding production problems may establish that the defendants made statements that were false *in hindsight*, but that is insufficient to establish fraud.  *Level 3 Communications,* 667 F.3d at 1347.  The Court cannot, without particularized cause, assume that the later-disclosed production problems were known to GRC or its executive officers at the moment of the alleged misrepresentations.

Another misleading statement on which plaintiff focuses seems to result from investor confusion over the July 19 press release, in which GRC announced that "[t]onnes from stoping as a percentage of milled ore decreased from an estimated year-to-date high of 55% during the first quarter of 2012 to an estimated year to-date low of 15% during the second quarter."  First Amended Complaint ¶¶ 89, 106.  Plaintiff argues that GRC's statement intentionally mislead investors into believing that the stope percentage for the first quarter was an *average* of 55%, relying on one investor's apparent misunderstanding.  However, as GRC explained on the August 10 earnings call, the percentage was stated in the press release as a year-to-date *high* stope percentage, which occurred in the first quarter.  *Id.* ¶ 106.  Plaintiff cannot establish that a statement is intentionally misleading or false simply because an investor misread a press release that unambiguously states an uncontested fact.

Finally, plaintiff relies on GRC's failure to follow generally accepted accounting principles ("GAAP") to establish scienter.  GAAP is "a body of pronouncements that govern the measurement and reporting of financial information and related disclosure."  *McNamara v. Pre-Paid Legal Services, Inc.,* 189 F. App'x 702, 705 n. 7 (10th Cir. 2006) (citing *United States v.*

*Arthur Young & Co.*, 465 U.S. 805, 811 n. 7 (1984)(defining GAAP as "the conventions, rules, and procedures that define accepted accounting practices")).

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Fleming Cos.*, 264 F.3d at 1261; *see also Adams*, 340 F.3d at 1105. Rather, in the context of other particularized and relevant facts, accounting errors can be relevant in determining whether allegations are sufficient to support a strong inference of scienter. *Adams*, 340 F.3d at 1105–06. To state a sufficient claim, allegations of GAAP violations must be "coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors." *Fleming Cos.*, 264 F.3d at 1261.

In *Adams*, the Tenth Circuit discussed allegations of the scienter of the chief financial officer of the defendant corporation. 340 F.3d at 1105–1106. The court there found persuasive that fact that "the alleged GAAP violations come on top of other particularized facts indicating that a key operation of the company was losing money, [the chief financial officer] knew that fact, and he falsely reported a profit for it." *Id.* at 1106. The complaint alleged that the chief financial officer was directly informed of unprofitable ventures by the assistant treasurer of the company, and that he himself complained of the financial losses. *Id.* at 1088–89, 1106. The alleged GAAP violations there "strengthen[ed] the inference that [the chief financial officer] signed financial statements with intent to deceive, particularly in light of the detail with which the alleged GAAP violations are stated, the fact that [he] was Kinder-Morgan's chief financial officer, and the fact that the Company's financial reports declared that Kinder-Morgan's financial statements were prepared in accordance with GAAP." *Id.* at 1106.

Plaintiff argues that the First Amended Complaint does allege additional factors that contribute to a finding of scienter: (1) the error necessitated a restatement of previously issued

sworn financial statements; (2) the violated accounting rules were simple in nature; (3) the accounting errors concerned revenue recognition; (4) GRC's actual accounting policies differed from its stated policies; (5) senior management played a role in the error; (6) the errors were related to core operations of GRC; (7) GRC is a small-sized company; (8) GRC admitted to weak internal financial controls; (9) GRC submitted sworn Sarbanes-Oxley certifications; (10) the magnitude of error resulted in a $4 million loss; (11) the existence of a quick settlement in an ancillary dispute.  [#39] at 21–25.  However, unlike in *Adams* where the court relied on other facts evincing knowledge of the defendant executive, the GAAP violations here do not "come on top of other particularized facts indicating that a key operation of the company was losing money, [the defendant executives] knew that fact, and [they] falsely reported a profit for it."  *Id.* at 1106.  Plaintiff's arguments seem to misunderstand the need for *other* particularized facts showing fraudulent intent; many of these facts relate to the same accounting error that, standing alone, is insufficient.  The only facts not directly tied to the accounting error are that GRC is a small-sized company and that there was an ancillary dispute that was settled quickly.

The Court agrees with defendants that here, "[w]hen the relevant personnel are separated by nearly 2,000 miles and international borders," the size of the company cannot be the sole bolster to unearth some trace of scienter.  Resp., [#40] at 12.  Plaintiff likewise cannot rely on what it calls an "ancillary dispute"—that GRC's buyer allegedly accused GRC of "falsifying sales invoices."  First Amended Complaint ¶ 112.  Both logically and chronologically, that dispute with the buyer is inherently not an "ancillary" charge of fraud where any such charge is the direct cause of the alleged fraudulent error here.  In any event, beyond a conclusory allegation, plaintiff states no facts showing that such an accusation by GRC's buyer ever occurred or that GRC intentionally sought to cover it up by a quick settlement.

Plaintiff also relies heavily on what he characterizes as an "admission" by GRC that GRC was aware of the "overbilling" variances by March of 2012. Plaintiff appears to pull this "admission" from an earnings call on November 15, 2012.[4]   Nonetheless, plaintiff relies on an out-of- context statement of a larger representation by defendants:

> So management in Denver was not notified of these issues regarding significant variances for February and later months until the third quarter when the umpire assay results had come back, and we could see that a pattern of large variances had developed. *Though some of our people in Oaxaca were aware of the variances within a month or 2 following shipment, they didn't communicate that up the ladder to us at that time as they were proceeding with the view that those numbers were wrong and would ultimately be corrected through the umpire assay process.* But the accounting rules take a different perspective on this situation, and had we, executive management, known of the magnitude of this variance, it is possible we would have provided a reserve against revenues in the first quarter. Because the issue was not communicated up the chain, it was identified as a material weakness for financial reporting purposes. This material weakness has now been addressed and corrected, but it is the reason for the restatement of the first and second quarters as opposed to simply making adjustments in the third quarter.

November 15 earnings call transcript, [#38-7] at 4. This "admission" that plaintiff depends on to prove defendants' knowledge actually demonstrates that the executives were not the ones with knowledge of the billing issues. Plaintiff fails to provide any connection—beyond sheer assumption—between the knowledge held by GRC's "people in Oaxaca" and that by the executive officers.

Any insinuation that the defendant executives had both the motive and opportunity to defraud the investors is likewise unpersuasive. "Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud." *Level 3 Communications*, 667 F.3d at 1346 (incentive-based compensation

---

[4] Plaintiff does not state from where he has drawn the supposed admission. *See* First Amended Complaint ¶¶ 54, 137, 150. The Court cannot discern any allegation in the complaint that supports this argument except for this statement in the November earnings call.

common among executives at publicly traded companies and does not ordinarily indicate scienter); *cf. Adams*, 340 F.3d at 1106 (the fact that defendant "was the most senior executive of the Company is a fact relevant in our weighing of the totality of the allegations," but direct knowledge of the chief executive officer was "an important link in the inferential chain").

In sum, the class action complaint neither pleads facts demonstrating fraudulent intent nor describes "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Anixter v. Home–Stake Production Co.*, 77 F.3d 1215, 1232 (10th Cir.1996) (internal quotation marks and citation omitted). Accordingly, the Court finds that, when viewing the pleadings in their totality, plaintiff fails to state factual allegations establishing a strong inference of scienter.

### 3. Control Person Liability Claim.

Defendants also move to dismiss plaintiff's claim for violation of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) for control person liability.  Because plaintiff has failed to plead a "primary violation of the securities laws," he also has failed adequately to plead a Section 20(a) violation.  *See Fleming*, 264 F.3d at 1270 ("[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person.").  Accordingly, that claim for relief is also dismissed.

### Order

1.  Defendants' Motion to Dismiss Plaintiff's First Amended and Consolidated Class Action Complaint [#35] is GRANTED.  Plaintiff's amended consolidated class action complaint

[#32] is DISMISSED WITH PREJUDICE, thereby dismissing cases 12CV2832 and consolidated case 12CV2971.

2.  Lead Plaintiff's Motion to Strike or Disregard Portions of Defendants' Reply [#43] is DENIED.

3.  Defendants are awarded their costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 15th day of July, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge